## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **PRIMUS GROUP, LLC** | : | |
| **40 E. LONG STREET** | : | |
| **COLUMBUS, OHIO 43215** | : | **CASE NO. 2:19-cv-03450-EAS-KAJ** |
| | : | |
| **PLAINTIFF,** | : | |
| | : | |
| **VS.** | : | |
| | : | |
| **SMITH & WESSON CORP.** | : | **Judge Edmund A. Sargus, Jr.** |
| **c/o REGISTERED AGENT SOLUTIONS,** | : | |
| **INC.** | : | **Magistrate Judge Kimberly A. Jolson** |
| **4568 MAYFIELD RD. SUITE 204** | : | |
| **CLEVELAND OH 44121** | : | **CLASS ACTION AMENDED** |
| | : | **COMPLAINT FOR DAMAGES AND** |
| | : | **INJUNCTIVE RELIEF** |
| **AND** | : | |
| | : | |
| **BUSHMASTER FIREARMS** | : | |
| **INTERNATIONAL** | : | |
| **P.O. BOX 556** | : | |
| **MADISON, NC 27025** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **SIG SAUER, INC.** | : | |
| **c/o COGENCY GLOBAL INC.** | : | |
| **3958-D BROWN PARK DRIVE** | : | |
| **HILLIARD OH 43026** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **DPMS FIREARMS** | : | |
| **1816 REMINGTON CIRCLE SW** | : | |
| **HUNTSVILLE, AL 35824** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **STURM, RUGER & CO., INC.** | : | |
| **271 CARDWELL RD.** | : | |
| **MAYODAN, NC 27027** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **REMINGTON ARMS COMPANY, LLC** | : | |
| **c/o CT CORPORATION SYSTEM** | : | |

**4400 EASTON COMMONS WAY**     :
**SUITE 125**     :
**COLUMBUS OH 43219**     :
     :
     :
**AND**     :
     :
**COLT'S MANUFACTURING**     :
**COMPANY, LLC**     :
**545 NEW PARK AVE.**     :
**WEST HARTFORD, CT 06110 USA**     :
     :
**AND**     :
     :
**ARMALITE**     :
**525 E. PINNACLE PEAK RD STE 100,**     :
**PHOENIX, ARIZONA 85024**     :
     :
     :
     **DEFENDANTS.**     :

Plaintiff, Primus Group, LLC ("Primus"), by and through its undersigned counsel, hereby files this Class Action Amended Complaint For Damages and Injunctive Relief, individually, and on behalf of all others similarly situated—and makes these allegations based on information and belief and which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery—against the above-named Defendants (collectively, "Defendants" ), as follows:

## INTRODUCTION

1.     This is a class action for damages and injunctive relief stemming from mass shootings enabled by Defendants' assault weapons, including without limitation the AR-15 style rifle ("AR-15").

2.     The equitable powers of the federal judicial branch are being invoked due to the grave omnipresent threat of massive carnage posed by the continued supply by Defendants of combat style semi-automatic weapons (hereinafter, "assault weapons") to persons with behavioral/disabilities or intention to commit domestic terrorist and hate-motivated acts upon innocent civilians.

3.     In current contemporary domestic circumstances, gun violence has been and is occurring throughout the United States with alarming frequency. This gun violence not only poses an imminent threat of irreparable harm to American society, it poses an inevitable threat.

4.     Mass shootings like those which occurred recently in El Paso, Dayton, and Brooklyn are going to happen again unless the Court takes immediate action. Mass shootings facilitated by assault weapons and law enforcement sized magazines, and ammunition with instantaneous destructive power, are being directed with continuing frequency upon crowds of people within seconds at schools, churches, shopping centers, and entertainment venues such as those operated by Plaintiff. These weapons and the rounds they fire are designed to produce entry level wounds the size of a coin, but exit wounds like hand grenades or cannons. Accordingly, cause is brought to this Court on behalf of all citizens, persons and inhabitants of the United States of America who seek a Declaration of the existence of a public nuisance and a "clear and present danger" to the health, welfare, safety and lives of all people living in the United States because of the persistent killing and wounding of countless persons, most recently in Texas and the Southern District of Ohio, with the use of assault weapons.

5.     As of August 31, 2019, 297 mass shootings have occurred in 2019 alone. This averages out to 1.2 shootings per day. In these shootings, 1,219 people were injured and 335 died (for a total of 1,554 victims).

6.      Since 2013, there has been only one full calendar week — the week of January 5, 2014 — without a mass shooting. The longest respite was 11 days between January 8, 2013, and January 18, 2013, when no mass shootings were reported, according to the Gun Violence Archive.

7.      On April 16, 2007, "thirty-three people were killed on the campus of Virginia Tech in . . . the deadliest shooting rampage  in American history [up to that time]." "Witnesses described scenes of mass chaos and unimaginable horror as students were lined up against a wall and shot." Two people were shot and killed in a dormitory, and two and a half hours later, another 31 people, "including the gunman, were shot and killed across campus in a classroom building." "According  to  a  federal  law  enforcement  official,  the  gunman  did  not  have identification and could not be easily identified visually because of the severity of an apparently self-inflicted wound to the head."

8.      On July 20, 2012, the AR-15 style assault weapon was part of James Holmes' arsenal when he opened fire during the midnight screening of "The Dark Knight Rises" at a movie theater in Aurora, Colorado, killing 12 people and injuring 70 others.

9.      A Portland, Ore., mall filled with holiday shoppers was the scene of a mass shooting in December 2012, when Jacob Tyler Roberts killed two people with an AR-15.

10.      Three days later, on December 14, 2012, Adam Lanza killed 26 people — including 20 schoolchildren — at Sandy Hook Elementary School in Newtown, Conn. with an AR-15.  Below is an image of that school shooting scene:



11.     On June 7, 2013, John Zawahri was also armed with an AR-15 when he went on a rampage at the Santa Monica Community College outside of Los Angeles. He killed five people and wounded four before he was killed in a shootout with cops.

12.     On Dec. 2, 2015, the AR-15 was one of the weapons used to kill 14 people and wound 22 more in an attack on the Inland Regional Center in San Bernardino, California.

13.     More recently, on July 29, 2019,  one man was killed and several other people were shot and seriously hurt during a mass shooting at a playground in Brooklyn, New York.

14.     Less than a week later, another mass shooting occurred at a Walmart store in El Paso, Texas.  On the morning of August 3, 2019, a gunman shot and killed 22 people and injured 24 others. The El Paso carnage is the deadliest mass shooting in the United States in 2019, the

seventh deadliest since 1949, and the third deadliest in Texas. An image from the El Paso mass shooting:



15.     The day after El Paso, yet another mass shooting was carried out, this time in Dayton, Ohio. Ten people were killed (including the perpetrator) and 27 others were injured. Seventeen of the injured were shot by the gunman. Two hours before the attack, the gunman was seen entering a bar with his sibling and a friend in the downtown Oregon Historic District of Dayton. At about 12:13 a.m., he split from the two and was recorded leaving the bar. At 1:05 a.m., eyewitnesses reported that a man opened fire at the entrance of Ned Peppers Bar in the Oregon Historic District.  He was carrying a firearm that included part of an Anderson Manufacturing semi-automatic AM-15 (based on the AR-15). He fired into the crowd, fatally shooting nine people.  An image from the Dayton, Ohio, mass shooting:



16.     The AR-15 style rifle that is available today is a variant of the M16 rifles used by military forces worldwide. Originally designed by Armalite (the "AR" in "AR-15"), the AR-15 was used in the Vietnam War, when soldiers needed a lightweight weapon that fired small-caliber ammunition. Following the mass shootings of 2012, the market for AR-15s exploded.

17.     The AR-15 style has been called "America's Gun" and "the Black Rifle," but it has a very dark history.  "Almost every mass shooting involves an AR-15 assault rifle," said Staff Sgt. Alonzo Lunsford, who was wounded by Maj. Nidal Hasan during the 2009 Fort Hood shooting in 2009, as quoted by CNN. "It's the preferred mass shooter's weapon of choice. But I don't see a logical reason why any civilian needs to have one of these killing machines."  "This is one more event to add to the litany of massacres that occur when a deranged person or grievance killer is able to obtain multiple weapons — including a military-style assault rifle [the

7

AR-15] — and kill many people in a short amount of time," Sen. Dianne Feinstein (D-Calif.) said in a Sept. 16, 2013 statement. "When will enough be enough?"

18.     Make no mistake -- this case is about one thing: corporate greed. Defendants put their desire for profits above the lives and well-being of the public at the cost of Primus, and similarly situated individuals and companies. Plaintiff seeks accountability for the consequences of that choice.

## JURISDICTION AND VENUE

19.     Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

20.     Jurisdiction is founded upon the provisions of 28 U.S.C. §§1331 and 1343 in that this action arises under federal law, and involves a conspiracy in violation of 18 U.S.C. §1961, *et seq*.  Jurisdiction is also based upon 28 U.S.C. §1651, The All Writs Act.

21.     Venue is properly laid in the Southern District of Ohio ("Southern District") for the reason the events described  herein below touch and concern the Southern District.

22.     All Defendants are subject to the personal jurisdiction of this court under Fed. R. Civ. P. Rule 4(e) under the nationwide service of process provisions of the Racketeer  Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962. The Southern District is the most convenient venue. The conduct threatening Plaintiff and continuing to  threaten it and the class represented by Plaintiff occurred in the Southern District. The   individual Defendants reside throughout the United States. The acts complained of took place  in the Southern District. It is in the interests of justice that the individual defendants  be made party to an action in this District under 18 U.S.C.A. § 1965(b).

## PARTIES

23.     Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

24.     Plaintiff, Primus, LLC is an Ohio limited liability company that operates as an entertainment venue, specifically restaurants and nightclub in the central business district of Columbus, Ohio. It is bringing this lawsuit as a class action on both the plaintiff and defense side. Primus is typical of any entity that operates where people assemble to attend, *inter alia*, entertainment or music venues, restaurants, bars, stadiums and shopping centers. Plaintiff and all these entities now lose market share due to public hysteria over the real threat of mass shootings, and have significantly increased costs due to the resulting increased security requirements.

25.     Plaintiff has standing to bring an action for the assault weapon public nuisance created by defendants. Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein, including, *inter alia*, to bring claims under the federal Racketeer Influenced and Corrupt Organizations Act statute, pursuant to 18 U.S.C. §1961(3) ("person[s]" include entities which can hold legal title to property) and 18 U.S.C. §1964 ("person[s]" have standing).

26.     The corporate Defendants or parties similarly situated can be identified specifically following limited jurisdictional discovery. All Defendants are manufacturers of weapons referred to herein as "assault weapons," a term that refers to semiautomatic rifles such as the AR-15 style. The list of weapons the Defendants manufacture and are the subjects of this Amended Complaint are listed at Exhibit A.

27.     The incidents which give rise to this Action are so horrific, frequent and likely to recur at any instant, such as those described hereinabove, three having occurred recently in

Brooklyn, El Paso and Dayton, so that judicial notice may be taken that, unless immediate measures are undertaken to interdict the availability of these instruments specifically designed to kill people and prevent their sale, more death and carnage will occur. Subsequent to the immediate enjoining of distribution and sale, measures may be taken to recall those assault weapons already in the hands of the public. This Amended Complaint constitutes a request for drastic and immediate judicial action by reason of the extremely critical and exigent circumstances currently facing the nation that has led to the marketing of bullet proof back packs for children and caused citizens to hesitate before even leaving their homes. An immediate temporary order is an unfortunate but necessary step to address the grave threat to public safety and terroristic climate caused by mass shootings with assault weapons.

## CLASS ALLEGATIONS

28. Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and a class ("Class"). The Class Period commenced on August 2, 2019.

29. Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(1) on behalf of a class defined as:

> All persons entitled to freely attend or visit schools, shopping locations, churches, entertainment venues, and other public places in the United States without the intrusion of individuals armed with assault weapons.

30. Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of a class defined as set forth in Paragraph 29 for the reason adjudication of the issues raised here will be dispositive of the claims of all persons affected.

31. Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(3) on behalf of a class defined as set forth in Paragraph 29 for the reason questions of law common to the class predominate over the claims of individual class members.

32.   The claims of Plaintiff are typical of the claims of the Class.  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has no conflicts with any other Class Member, and has retained competent counsel experienced in class action litigation.

33.   Common questions of law and fact exist.  Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

34.   Class action treatment is a superior method for the fair efficient adjudication of the controversy described herein.  A class action provides an efficient method whereby enforcement of the rights of Plaintiff and Defendants can be fairly managed.

35.   Plaintiff also brings this as a Defendants class action inasmuch as Defendants have acted on grounds that generally apply to the class and the named Defendants are adequate representatives of the Class.

## FACTUAL ALLEGATIONS

36.   Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

37.   The assault weapon, including the AR-15 style, was designed as a military weapon, and it has always excelled on the battlefield. Born out of the exigencies of modern combat, the AR-15 was engineered to deliver maximum carnage with extreme efficiency.

38.   After extensive testing, the U.S. military concluded that a five-man squad armed with AR-15s had equal or superior "hit-and-kill" potential in combat situations when compared with an 11-man squad armed with M14 rifles, the AR-15's predecessor. Troops field-testing the AR-15 reported instantaneous deaths, as well as routine amputations, decapitations, and massive body wounds. The military ultimately adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

11

39. After Armalite sold its licensing rights to the AR-15, Colt took over its military contracts and began manufacturing the M16.

40. Today, Colt remains the largest supplier of combat rifles to the military.

41. Defendant Bushmaster, meanwhile, holds the distinction of being the largest supplier of combat rifles to civilians.

## A. Mass-Shooters' Weapon of Choice: Assault Weapons

42. Assault weapons are a class of semi-automatic firearm specifically designed to kill humans quickly and efficiently. They are a relatively new class of weapon; during the 1980s, the gun industry sought to reverse a decline in consumer demand for guns by developing and marketing new types of weapons based on high-powered military designs. Violence Policy Center, *The Militarization of the US Civilian Firearms Market* (June 2011), http://www.vpc.org/studies/militarization.pdf.

43. The military features that distinguish assault weapons such as the AR-15 from standard sporting firearms enable shooters to spray large amounts of ammunition quickly while retaining control of the gun. For this reason, assault weapons are frequently the guns of choice for individuals who carry out horrific public attacks.

44. A review of 62 mass shootings between 1982 and 2012 by *Mother Jones* found that assault weapons were recovered in almost a quarter of them. Mark Follman et al., "*More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines,*" Mother Jones, Feb. 27, 2013, http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein.

45. Because of their deadly design, assault weapons amplify the carnage of public shootings. A review of mass shootings between 2009 and 2015 by Everytown for Gun Safety

found that incidents where assault weapons or large capacity ammunition magazines were used resulted in 155% more people shot and 47% more people killed compared to other incidents. Everytown for Gun Safety, *Analysis of Mass Shootings* (Aug. 20, 2015) https://everytownresearch.org/reports/mass-shootings-analysis.

46.     On the other hand, when access to assault weapons is restricted, deaths due to mass shootings decrease. A 2014 study found that "both state and federal assault weapons bans have statistically significant and negative effects on mass shooting fatalities." Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, Applied Economics Letters 22, no. 4 (2014): 281-284, http://www.tandfonline.com/doi/abs/10.1080/13504851.2014.939367.

47.     Assault weapons also pose a threat to law enforcement. A study analyzing FBI data showed that 20% of the law enforcement officers killed in the line of duty from 1998 to 2001 were killed with assault weapons. *Officer Down, Assault Weapons and the War on Law Enforcement*, Violence Policy Center, Accessed January 15, 2019, http://www.vpc.org/studies/officeone.htm.

48.     According to a survey by the Police Executive Research Forum (PERF), "Thirty-seven percent of the police agencies responding…reported that they have seen noticeable increases in criminals' use of assault weapons" since the expiration of the federal assault weapons ban in 2004. Police Executive Research Forum, *Guns and Crime: Breaking New Ground by Focusing on the Local Impact* (May 2010), http://www.policeforum.org/assets/docs/Critical_Issues_Series/guns%20and%20crime%20-%20breaking%20new%20ground%20by%20focusing%20on%20the%20local%20impact%202020 10.pdf.

49.    A 2007 report by the International Association of Chiefs of Police recommended that Congress enact an effective ban on military-style assault weapons in order to curb the ability of individuals to "outgun" law enforcement officers.  International Association of Chiefs of Police (IACP), *Taking a Stand: Reducing Gun Violence in Our Communities* (2007), https://web.archive.org/web/20180809115433/https://www.theiacp.org/Portals/0/pdfs/GVR_A-page-iii_IACP-Taking-A-Stand.pdf.

**B.    A "Civilian" Weapon Designed for Combat**

50.    An AR-15 style rifle is essentially indistinguishable from its military sibling, the M16. Both weapons are designed for mass casualty assaults. Both share design features of exceptional muzzle velocity, the ability to accommodate large-capacity magazines, and effective rapid fire.

<u>Muzzle Velocity</u>

51.    The term "muzzle velocity" refers to the speed a bullet possesses at the moment it leaves the muzzle of a firearm.

52.    The velocity of a bullet on impact is the main determinant of its destructive capacity.

53.    Typical handgun muzzle velocities range from approximately 750 feet per second to approximately 1,300 feet per second.

54.    Because longer barrels give the ammunition's propellant more time to work, long guns eject projectiles at significantly higher velocities than short-barreled firearms.

55.    AR-15 rifles like Bushmaster's XM15-E2S, for example, are capable of propelling ammunition at 4,000 feet per second, which multiplies the lethality of each hit.

14

56.     According to a study by physicians who performed autopsies on soldiers killed by gunfire in Iraq, the greater the speed of the bullet on impact, the greater the extent of tissue deterioration. The study found that rounds with a velocity exceeding 2,500 feet per second cause a shockwave to pass through the body upon impact that results in catastrophic injuries even in areas remote to the direct wound.

57.     The AR-15 style proved to be very good at its job. It has endured as the United States Army's standard-issue rifle and has more recently become a valuable law enforcement weapon. In both contexts, however, the AR-15 is subject to strict safety measures, including advanced training and regimented storage.

<u>Large-Capacity Magazines</u>

58.     In addition to exceptional muzzle velocity, assault weapons are also *designed* to accept large-capacity magazines.

59.     Such magazines were first designed and produced for the military in order to increase the firepower of U.S. infantry by minimizing time spent reloading.

60.     Defendants' "civilian" assault weapons are manufactured to be compatible with large capacity magazines.

<u>Effective Rapid Fire</u>

61.     Assault weapons can empty their magazines with exceptional speed.

62.     The rifles carried by U.S. forces are capable of both fully automatic and semiautomatic fire. Fully automatic fire can empty a 30-round magazine in two seconds. Semiautomatic fire can empty the same 30-round magazine in approximately ten seconds.

63.     The United States Army considers semiautomatic fire more effective than automatic fire in most combat situations.

64.　"Civilian" semiautomatic rifles like the AR-15 are thus capable of the same rapid fire that the U.S. Army deems optimal for the military theater.

65.　 Structurally and mechanically, therefore, assault weapons remain the progeny - and instruments - of war.

66.　Semiautomatic fire unleashes a torrent of bullets in a matter of seconds; large-capacity magazines allow for prolonged assaults; and powerful velocity makes each hit catastrophic.

67.　The net effect is more wounds, of greater severity, in more victims, in less time.

68.　This superior capacity for lethality is why the AR-15 style has endured as the U.S. military's weapon of choice  for 50 years.

## C.　A "Civilian" Weapon Marketed for Combat

69.　The uniquely military characteristics of the AR-15 type rifle are not lost on the Defendants. In fact, they are the weapon's primary selling point.

70.　For example, Defendant Bushmaster has touted Bushmaster rifle barrels as "the finest AR15-Type / M16-Type barrels made," promising that they "provide the same matte black, non-reflective finish found on quality military-type arms."

71.　When Defendant Bushmaster rolled out a new AR-15 rifle model, its advertising lauded the gun as "the uncompromising choice when you demand a rifle as mission-adaptable as you are."

72.　The Bushmaster 2019 Product Catalogue proclaims: "THE UNITED STATES OF AMERICA WAS FOUNDED ON JULY 4, 1776. NOT BECAUSE ANYONE LET US.  BUT BECAUSE FREEDOM COULDN'T BE STIFLED. AND IT'S AS TRUE TODAY AS IT WAS

16

BACK THEN: LIFE AND LIBERTY DEPEND ON THOSE WITH THE TOOLS AND DETERMINATION TO DEFEND THEM."

73.    In 2019, the Bushmaster Defendants promote one of their "civilian" rifles as "Adaptive Combat Rifles."

74.    The Defendants' militaristic marketing reinforces the image of the AR-15 as a combat weapon used for the purpose of waging war and killing human beings.

75.    This marketing tactic dovetails with the widespread popularity of realistic and addictive first-person shooter games - most notably "Call of Duty" - that prominently feature AR-15s and rewards players for "head shots" and "kill streaks" among other assaultive and violent "achievements."

76.    It is widely known, for example, that "Call of Duty" exposes players to intensely realistic tactical scenarios and teaches assaultive weapon techniques such as "taped reloads," which allow high capacity magazines to be taped together to reduce reloading time

**D.  A "Civilian" Weapon with no Legitimate Civilian Purpose**

77.     As set forth above, the assault weapon's combination of exceptional muzzle velocity, ability to accept large-capacity magazines, and effective rapid fire has significant utility in the ***military*** context. These same features make the weapon ill-suited for legitimate civilian purposes.

<u>Self-Defense</u>

78.    There is no evidence that assault weapons are commonly used for, or necessary for, legitimate self-defense by law-abiding citizens.

79.    Semiautomatic rifles' length makes them inferior to smaller guns in the confines of a home.

80.    It is **handguns**, not long guns, that are widely considered to be the optimal weapon for home defense.

81.    In *D.C. v. Heller*, 554 U.S. 570, 629 (2008), the Supreme Court of the United States extolled the handgun as the "quintessential self-defense weapon." The Court cited several reasons for this: "It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." These virtues are absent from assault weapons.

82.    Semiautomatic weapons are not only ill-suited to home defense, they are dangerous when used in that capacity.

83.    The velocity and rate of semiautomatic fire in the home creates a significant risk of what is referred to as "over-penetration," where bullets breach walls and doors, putting family members, neighbors, and even passers-by at risk.

84.    The military has concluded that use of the M16 in close quarters greatly increases the risk of noncombatant casualties, and trains soldiers accordingly.

85.    When a Bushmaster AR-15 was reviewed by Guns & Ammo Magazine in 1983, the reviewer commented: "As a home defense weapon, it certainly possesses ample firepower with a 30-round magazine, but the .223 cartridge is a mite too powerful and penetrating for this use." It concluded that the rifle would instead be of value to "a police S.W.A.T. team in close-quarter encounters with evil-doers."

86.    Moreover, the ability to accept large-capacity magazines, vital for modern combat, is unnecessary for home defense.

87.     The National Rifle Association Institute for Legislative Action ("NRA-ILA") maintains a database of "armed citizen" stories describing private citizens who have successfully defended themselves or others using a firearm. According to a study of all incidents in that database from 1997 to 2001, an average of 2.2 shots were fired by defenders. In 28% of incidents, no shots were fired at all.

88.     A similar analysis was performed for the period of 2011-2013 and revealed that defenders fired an average of 2.1 shots.

89.     The likelihood of an AR-15 causing accidental harm when used for home defense substantially exceeds the likelihood that large quantities of semiautomatic fire will be necessary for protection.

ENTRUSTMENT OF MILITARY WEAPONS TO THE MILITARY

90.     When assault weapons are sold to the military, the seller entrusts them to a highly regulated institution with expertise in minimizing the risk of physical harm - whether criminal or accidental - to soldiers or others.

91.     Standardized medical fitness standards prohibit induction, enlistment, appointment, or retention in the Armed Forces if the individual suffers from major depression, bipolar disorder, affective psychoses, or a history of symptoms consistent with mental instability that impairs school, social, or work efficiency.

92.     When the U.S. Government purchases assault weapons for use by armed forces, it retains ownership of those weapons.

93.     Military assault weapons are issued to soldiers for instruction, training, exercises, and combat.

94.     Soldiers are held strictly accountable for their assault weapon at all times.

95.     Assault weapons must be kept in safety mode when not in use.

96.     Soldiers are instructed not to leave their assault weapons unattended under any circumstances.

97.     If an assault weapon cannot be accounted for, the Army will place an entire base or installation on lockdown until the weapon is located.

98.     If an assault weapon is misplaced in a combat zone, the soldier may face severe sanctions.

99.     Assault weapons are stored in secure weapons rooms on military bases. Soldiers must sign out their rifle anytime they remove it so a chain of custody is established.

100.    The military requires soldiers to undergo extensive training on the proper use of an assault weapon, including techniques to minimize the weapon's potential for inflicting collateral damage.

101.    The Department of the Army produces a 400-page manual for commanders, leaders, and instructors devoted exclusively to weapon pedagogy and related safety issues.

102.    According to the manual, soldiers are first instructed on the weapon's capabilities, mechanical training, and the fundamentals and principles of rifle marksmanship. Live-fire applications are scheduled only after the soldier has demonstrated preliminary skills.

103.    To ensure safety during live-fire applications, ammunition is issued to firing units immediately before scheduled training exercises and released to troops only when they are on the firing line.

104.    Commanders are charged with identifying any "hazards" to safety by using a complex "risk assessment matrix" to estimate the probability and severity of an adverse impact. The manual notes that hazards may arise from health or behavioral concerns.

105.    Military leadership is empowered to prevent access to combat weapons if circumstances warrant it.

## ENTRUSTMENT OF MILITARY WEAPONS TO LAW ENFORCEMENT

106.    When military-grade weapons are sold to law enforcement, the seller entrusts them to organizations and departments that regulate and oversee officers' access to firearms and possess expertise in minimizing the risk of physical harm to civilians.

107.    Prior to being entrusted with assault rifles, law enforcement officers undergo extensive training.

108.    Officers are trained on when it is and is not appropriate to use an assault rifle.

109.    For most engagements in which it is necessary to draw or use a firearm, law enforcement considers an officer's sidearm - and not an assault rifle - to be the most appropriate weapon.

110.    Police leadership is empowered to remove any weapon from an officer if circumstances warrant it.

## ENTRUSTMENT OF MILITARY WEAPONS TO THE PUBLIC

111.    The military and law enforcement have a legitimate need for a weapon as lethal as the assault weapon, but they also recognize that strict safety measures are necessary to protect soldiers, police officers, and innocent civilians from physical harm. Consequently, entrusting assault weapons to these specialized institutions is reasonable.

112.    ***The same is not true for the entrustment of assault weapons to civilians***.

113.    In addition to the lack of utility set forth above, when assault weapons are entrusted to the public there is no  institutional structure in place to oversee the safe and intelligent use of those weapons.

114.    Assault weapons are sold to wholesalers and/or dealers who sell directly to civilians.

115.    Large capacity magazines that are compatible with assault weapons are sold to wholesalers and/or dealers who sell directly to civilians.

116.    In the overwhelming majority of states, young people can legally purchase assault rifles before they are legally permitted to drink alcohol.

117.    In at least a dozen states, the minimum age for possession of an AR-15, for example, is 14 or 16, or there is no minimum age at all.

118.    In the overwhelming majority of states, a license or permit is not required to purchase or own an AR-15.

119.    In the overwhelming majority of states, no safety training is required for the purchase of an AR-15.

120.    There is not a single state that requires a mental health examination of a potential purchaser of an assault rifle.

121.    There is not a single state that requires a potential purchaser of an assault weapon to answer questions about other individuals with whom they intend to share access.

122.    More than half of American households with firearms do not store them securely.

123.    Civilians are entrusted with assault weapons  even though they are not suited for legitimate civilian purposes.

124.    Civilians are entrusted with assault weapons whether or not they have a mechanism to safely secure the weapons and ammunition in their home.

125.    Civilians are entrusted with assault weapons even if they have children in the home who can gain access to their weapons and ammunition.

126.    Civilians are entrusted with assault weapon even if they intend to make the weapon available to other persons, including those who may be mentally unstable.

127.    Several highly publicized mass shootings have demonstrated that perpetrators of mass shootings are able to purchase or otherwise acquire assault weapons.

128.    The most chilling legacy of the entrustment of assault weapons to the general population may be that Americans are no longer shocked when combat weapons are used to kill people as they work, shop, play, commute, attend school,  and otherwise go about their lives. We may be horrified, saddened, even sickened, but we can no longer be shocked.

129.    Assault weapons, however, have little utility for legitimate civilian purposes.  The weapon's size and overwhelming firepower, so well adapted to the battlefield, are in fact liabilities in home defense.

130.    Defendants - makers and sellers of assault weapons - have, like all Americans, watched mass shootings become a harrowing yet predictable part of modern life.

131.    Defendants know that, as a result of selling assault weapons to the civilian market, individuals unfit to operate these weapons gain access to them.

132.    Defendants also know that the assault weapons' military firepower, which is unsuited to home defense or recreation, enables an individual in possession of the weapon to inflict unparalleled civilian carnage.

133.    Despite that knowledge, Defendants continued to sell assault weapons to the civilian market.

134.    In order to continue profiting from the sale of assault weapons, Defendants chose to disregard the unreasonable risks these weapons posed outside of specialized, highly regulated institutions like the armed forces and law enforcement.

135.     Assault weapons and high-capacity magazines are commonplace in mass shootings and make shootings more lethal. Research shows that restrictions on assault weapons and high-capacity magazines can help prevent mass shooting injuries and fatalities as well as reduce the devastation of daily gun violence in America.

136.     Assault weapons and high-capacity magazines are exceptionally deadly. High-capacity magazines, commonly defined as ammunition magazines capable of holding more than 10 rounds, allow a shooter to fire more rounds without pausing to reload. The more rounds a shooter can fire consecutively, the more gunshot wounds they can inflict during an attack. De Jager E, Goralnick E, McCarty JC, Hashmi ZG, Jarman MP, Haider AH. *Lethality of civilian active shooter incidents with and without semiautomatic rifles in the United States*. Journal of the American Medical Association. 2018;320(10):1034-1035.

137.     Assault weapons are generally high-powered semiautomatic firearms where each round has up to four times the muzzle velocity of a handgun round. Rhee PM, Moore EE, Joseph B, Tang A, Pandit V, Vercruysse G. *Gunshot wounds: a review of ballistics, bullets, weapons, and myths*. Journal of Trauma and Acute Care Surgery. 2016 Jun;80(6):853-67.

138.     This means that each round from an assault weapon inflicts greater damage to the human body than a round from a typical handgun. *Ibid*. Moreover, assault weapons are generally designed to fire rounds at a greater rate than other firearms, and when combined with high-capacity magazines, they enable a shooter to fire more rounds over a short period.

139.     On average, one mass shooting—defined as an event in which four or more people are killed or injured with a firearm—happens every day in the United States. *Mass Shootings*, Gun Violence Archive, https://www.gunviolencearchive.org/mass-shooting. Calculations were based on the five most recent years of available data (2014-2018).

24

140.    Assault weapons and high-capacity magazines are frequently used in mass shootings, resulting in more deaths and injuries. Over the past decade, the five deadliest mass shooting incidents in America all involved the use of assault weapons and high-capacity magazines (Las Vegas, NV, 58 deaths; Orlando, FL, 49 deaths; Newtown, CT, 27 deaths; Sutherland Springs, TX, 25 deaths; Parkland, FL, 17 deaths).

141.    The 2009 Fort Hood, TX, shooter – who shot and killed 13 people and injured 32 more – specifically sought out high-capacity magazines in preparation for his attack. A witness to the shooter's purchase at a Killeen, TX, gun dealer reported, "He gave me two specifications. He said he wanted the most technologically advanced weapon on the market and the one with the highest magazine capacity." Huddleston, S. *Hasan sought gun with 'high magazine capacity.'* My San Antonio. October 21, 2010. https://goo.gl/NtfkNL.

142.    A study of mass shooting incidents between 1981 and 2017 found that assault rifles accounted for 86 percent of the 501 fatalities reported in 44 mass shooting incidents. DiMaggio C, Avraham J, Berry C, et al. *Changes in US mass shooting deaths associated with the 19942004 Federal Assault Weapons Ban: analysis of open-source data*. Journal of Trauma and Acute Care Surgery. 2019 Jan; 86(1):11-19.

143.    Assault weapons and high-capacity magazines are also frequently used in other crimes in our country. A recent study estimated that firearms equipped with high-capacity magazines, which include assault weapons as well as other high-capacity semiautomatic firearms, account for 22 to 36 percent of crime guns in most places, with some estimates upwards of 40 percent for cases involving serious violence, including homicides of law enforcement officers.   Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. *Criminal use of*

*assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources*. Journal of Urban Health. 2018 Jun;95(3):313-321.

144.     A 2018 study found that mass shooting fatalities were 70 percent less likely to occur from 1994 to 2004, when the federal prohibition on assault weapons and high-capacity magazines was in effect, than during the 12 years studied before and after the prohibition. Researchers estimate a federal Assault Weapon Ban (AWB) would have prevented 314 of 448 mass shooting deaths that occurred during the studied periods where the AWB was not in effect. DiMaggio C, Avraham J, Berry C, et al. *Changes in US mass shooting deaths associated with the Federal Assault Weapons Ban: analysis of open-source data*. Journal of Trauma and Acute Care Surgery. 2019 Jan; 86(1):11-19.

145.     The Defendants knew, or should have known, of the civilian population's poor track record of safely securing weapons.

146.     Mass casualty events, such as the mass shootings described above in El Paso, Dayton and Brooklyn, were within the scope of the risk created by the Defendants' manufacture and sale of assault weapons for the civilian market.

147.     Defendants knew, or should have known, of the unreasonably high risk that the assault weapons would be used in a mass shooting to inflict maximum casualties before law enforcement was able to intervene.

148.     Defendants knew, or should have known, that stores and entertainment venues are particularly vulnerable to - and frequently targets of - mass shootings.

149.     Defendants knew, or should have known, that the utility of assault weapons for hunting, sporting or self-defense was negligible in comparison to the risk that the weapon would be used in its assaultive capacity.

150. Defendants knew, or should have known, that the assault weapon, when used in its assaultive capacity, would be likely to inflict multiple casualties and serious injury.

151. Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business.

152. Defendants have for years sold assault weapons in a manner that foreseeably leads to the use of those weapons by unauthorized and unsafe users.

153. Defendants have had the ability for years to design and manufacture assault weapons for the civilian population with safety mechanisms that prevent the weapon from being fired by someone other than the purchaser.

154. Defendants have had the ability for years to design and manufacture assault weapons for the civilian market that do not accept large capacity magazines.

155. Defendants' conduct had a continuing inherent or natural tendency to create danger and inflict injury, was offensive to public policy, and posed a serious risk to public health, wealth and safety.

156. Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools, and of the public to be safe in stores, malls and entertainment venues.

157. Defendants knew, or should have known, that supplying assault weapons to the civilian market involved an unreasonable risk of physical injury to others.

158. The prevalence and frequency of these massive killings on innocents, including infants and small children, is such that a court may take judicial notice of the threat, its gravity and imminence.

159. On March 19, 2019, in *Soto v. Bushmaster Firearms Int'l, LLC,* 331 Conn. 53, 202 A.3d 262 (2019), the Connecticut Supreme Court ruled that, despite the Protection of Lawful Commerce in Arms Act[1] (PLCAA), the families of the Sandy Hook Elementary School shooting victims could proceed toward trial with their lawsuit against Bushmaster, the manufacturer of the assault rifle used in that shooting. As the Connecticut Supreme Court opinion ruled, there were numerous statements by PLCAA's sponsors asserting that the statute would bar only suits against gun companies that *engaged in entirely blameless conduct.* In the words of the leading sponsor of the bill, then-Sen. Larry Craig, at the time an NRA board member, "this legislation will not bar the courthouse doors to victims who have been harmed by the negligence or misdeeds of anyone in the gun industry."

160. As described herein, Defendants are ***not*** blameless.

## COUNT I: PUBLIC NUISANCE UNDER OHIO REV. CODE ANN. § 3767.41

161. Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

162. Defendants' conduct described herein constitutes a public nuisance within the meaning of Ohio Rev. Code Ann. § 3767.41(A)(2)(a) in that public buildings are a menace to the public welfare and safety so long as Defendants' assault weapons are readily accessible to the civilian population. Plaintiff brings this claim to abate conduct that perpetuates this nuisance. Preventing the sale of assault weapons to the civilian population in Ohio will help to abate the nuisance, will save lives, prevent injuries and will make the Southern District and the State of Ohio a safer place to enter, visit or be present in public buildings.

---

[1] 15 U.S.C.S. §§ 7901-7903.

163.    Defendants have the ability to act to abate the public nuisance, and the law recognizes that they are uniquely well positioned to do so. It is the manufacturers and sellers of assault weapons that have primary responsibility to assure the safety and appropriateness of their design, marketing, and promotion. And, all companies in the supply chain of assault weapons are primarily responsible for ensuring that such weapons are only distributed to appropriate users and not diverted. As manufacturers and distributors of assault weapons, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of these weapons, to act as a first line of defense.

164.    As a proximate result of Defendants' creation and maintenance of a public nuisance, Plaintiff has incurred substantial costs and expenses including but not limited to significantly increased security costs. Plaintiff incurred these costs for increased security due to Defendants' conduct as alleged herein, which fueled mass shootings and carnage.

### COUNT II: COMMON-LAW PUBLIC NUISANCE: ABSOLUTE NUISANCE

165.    Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

166.    The Defendants' conduct as previously alleged constituted, created and maintained a public nuisance in the Southern District which is an absolute nuisance or nuisance per se for which absolute liability attaches.

167.    Plaintiff and all members of the Class as defined hereinabove have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

168.    Defendants' ongoing conduct, as set forth herein, constitutes a public nuisance in the Southern District because it significantly interferes with the general public's health, safety, peace, comfort and convenience.

169.    Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools, and of the public to be safe in churches, stores and entertainment venues.

170.    Plaintiff brings this claim to abate Defendants' conduct that perpetuates this nuisance.  Preventing the sale of assault weapons to the civilian population in Ohio will help to abate the nuisance, will save lives, prevent injuries and will make the Southern District and the State of Ohio a safer place to live.

171.    As a proximate result of Defendants' creation and maintenance of a public nuisance, Plaintiff has incurred substantial costs and expenses including but not limited to significantly increased security costs. Plaintiff incurred these costs for increased security due to Defendants' conduct as alleged herein, which fueled mass shootings and carnage.

### COUNT III: COMMON-LAW PUBLIC NUISANCE: QUALIFIED NUISANCE

172.    Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

173.    Defendants' conduct as previously alleged constituted, created and maintained a public nuisance in the Southern District which is also a qualified nuisance for which they are liable because:

    a.    Defendants knew, or should have known, of the civilian population's poor track record of safely securing weapons;

b.  Mass casualty events, such as the mass shootings described above in El Paso, Dayton and Brooklyn, were within the scope of the risk created by the Defendants' manufacture and sale of assault weapons for the civilian market;

c.  Defendants knew, or should have known, of the unreasonably high risk that the assault weapons would be used in a mass shooting to inflict maximum casualties before law enforcement was able to intervene;

d.  Defendants knew, or should have known, that stores and entertainment venues are particularly vulnerable to - and frequently targets of - mass shootings;

e.  Defendants knew, or should have known, that the utility of assault weapons for hunting, sporting or self-defense was negligible in comparison to the risk that the weapon would be used in its assaultive capacity;

f.  Defendants knew, or should have known, that the assault weapon, when used in its assaultive capacity, would be likely to inflict multiple casualties and serious injury;

g.  Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business;

h.  Defendants have for years sold assault weapons in a manner that foreseeably leads to the use of those weapons by unauthorized and unsafe users;

i.  Defendants have had the ability for years to design and manufacture assault weapons for the civilian population with safety mechanisms that prevent the weapon from being fired by someone other than the purchaser;

j.  Defendants have had the ability for years to design and manufacture assault weapons for the civilian market that do not accept large capacity magazines; and

31

k.  Defendants' conduct had a continuing inherent or natural tendency to create danger and inflict injury, was offensive to public policy, and posed a serious risk to public health.

174.  Plaintiff and all members of the class as defined hereinabove have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

175.  Defendants' ongoing conduct, as set forth herein, constitutes a public nuisance in the Southern District because it significantly interferes with the general public's health, safety, peace, comfort and convenience.

176.  Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools, and of the public to be safe in churches, stores and entertainment venues.

177.  Plaintiff brings this claim to abate Defendants' conduct that perpetuates this nuisance.  Preventing the sale of assault weapons to the civilian population in Ohio will help to abate the nuisance, will save lives, prevent injuries and will make the Southern District and the State of Ohio a safer place to live.

178.  As a proximate result of Defendants' creation and maintenance of a public nuisance, Plaintiff has incurred substantial costs and expenses including but not limited to significantly increased security costs. Plaintiff incurred these costs for increased security due to Defendants' conduct as alleged herein, which fueled mass shootings and carnage.

## **COUNT IV: COMMON-LAW NEGLIGENT DESIGN**

179. Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

180. Defendants' assault weapons are defective in their design in that they are more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and the benefits of their semiautomatic design do not outweigh the risk inherent in such design.

181. Defendants' assault weapons are also defective in their design in that Defendants failed to incorporate feasible safety features to prevent foreseeable injuries.

182. As a proximate result of Defendants' negligent design of their assault weapons, Plaintiffs has incurred substantial costs and expenses including but not limited to significantly increased costs for security requirements.

183. Defendants are thus liable to Plaintiff for such costs based on a claim of common-law negligent design.

## COUNT V: COMMON-LAW FAILURE-TO-WARN

184. Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

185. Defendants' assault weapons involve risks that are not open and obvious to users including without limitation that semiautomatic guns can hold a bullet even when the ammunition magazine is empty or removed.

186. Defendants knew or should have known, in the exercise of reasonable care, of these risks, but which Defendants failed to warn about and failed to take precautions that a reasonable person would take in presenting the product to the public.

187.    As a proximate result of Defendants' failure to warn, Plaintiff has incurred substantial costs and expenses including but not limited to significantly increased costs for security requirements.

188.    Defendants are thus liable to Plaintiff for such costs based on a claim of common-law failure-to-warn.

## COUNT VI: RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961 - 1968 ("RICO")

189.    Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

190.    At all relevant times, Defendants have been "person[s]" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

191.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

192.     RICO makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. §1962(a), (b) or (c). 18 U.S.C. §1962(d).

193.    As alleged herein, at all relevant times, Defendants moved aggressively to capture a large portion of the assault weapons sales market. In so doing, Defendants launched an aggressive nationwide campaign overemphasizing the sport, entertainment and home defense utility  of assault weapons and deceptively marketing these weapons as being: (a) safe and appropriate for such uses; (b) necessary for the civilian population; and (c) required to combat

unknown, non-existent threats to freedom. Defendants also knowingly failed to report suspicious orders and purchases, thereby inundating the market with assault weapons.

194.    In particular, Defendants, along with other entities and individuals, were employed  by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Assault Weapon Fraud Enterprise") whose purpose was to deceive gun dealers, the public, regulators and Members of Congress into believing that assault weapons are (a) safe and appropriate for sports, entertainment and home defense uses; (b) necessary for the civilian population; and (c) required to combat unknown, non-existent threats to freedom.

195.    As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract billions of dollars of profit. As further explained below, defendants' years-long misconduct violated 18 U.S.C. §1962(c)-(d).

**A.  <u>The Assault Weapon Fraud Enterprise</u>**

196.    At all relevant times, Defendants, along with other individuals and entities, including unknown third parties involved in the marketing and sale of assault weapons, operated an "enterprise" within the meaning of 18 U.S.C. §1961(4) because they are a group of individuals associated in fact, even though they are not a collective legal entity. The Assault Weapon Fraud Enterprise: (a) existed separately from each of its component entities; (b) existed separately from the pattern of racketeering in which Defendants engaged; and (c) constituted an ongoing organization consisting of legal entities, including, but not limited to, employees and agents of the National Rifle Association ("NRA"), as well as other entities and individuals.

197.    Within the Assault Weapon Fraud Enterprise, there was a common communication network, by which members exchanged information on a regular basis through the use of wires and mail. The Assault Weapon Fraud Enterprise used this common

communication network for the purpose of deceptively marketing, selling and distributing assault weapons to the general public. When their products, sales, distributions and failure to report suspicious sales were contested by other parties, on information and belief the Assault Weapon Fraud Enterprise members took action to hide the scheme to continue its existence.

198.    The participants in the Assault Weapon Fraud Enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties and the continuing coordination of activities. Through the Assault Weapon Fraud Enterprise, Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share and minimizing losses. Each member of the Assault Weapon Fraud Enterprise reaped the bounty generated by the enterprise by sharing the benefit derived from increased sales of assault weapons and other revenue generated by the scheme to defraud consumers and by failing to report suspicious sales.

199.    The Assault Weapon Fraud Enterprise engaged, and continues to engage, in deceptive  marketing of assault weapons as appropriate, effective and necessary for sports, entertainment, home defense and defense of freedoms. Further, the Assault Weapons Fraud Enterprise continues to not report suspicious sales and to aggressively fight legal controls on sales.

200.    The Assault Weapon Fraud Enterprise has an organizational structure and policies designed to accomplish the following goals:

a.  The first goal of the Assault Weapon Fraud Enterprise is to manufacture a facially legal weapon,   to conduct a business scheme to reap profits by exposing the public to extreme danger posed by these weapons;

b. The second goal of the Assault Weapon Fraud Enterprise is to increase profits by misrepresenting the purpose of assault weapons.

c. The third goal of the Assault Weapon Fraud Enterprise is to enter into a contract for the sale of assault weapons with persons who intend to commit terrorist and illegal acts.

d. The fourth goal of the Assault Weapon Fraud Enterprise is to use the funds obtained to enrich shareholders or owners and to circumvent federal laws against murder and terrorism.

201. The enterprise has a history of involvement within Ohio, Texas and throughout the United States.

202. The enterprise is engaged in interstate commerce and its activities have a substantial effect on interstate commerce as follows:

a. The enterprise receives money through the mails and wires unlawfully from purchasers and deposits that money into financial institutions engaged in interstate commerce.

b. The Defendants' enterprises utilized the means of the internet, telephone calls, and mail in the regular course of business to communicate among themselves, to obtain the transfer of funds from buyers.

203. Defendants, individually and collectively, through their control of the Assault Weapon Fraud Enterprise, violated 18 U.S.C.A. § 1962(c) by conducting the enterprise's affairs through a pattern of racketeering activity as defined in 18 U.S.C.A. § 1961(1)(B) consisting of numerous acts of mail and wire fraud in violation of 18 U.S.C.A. §§1341 and 1343.

204. Specifically, Defendants committed the following predicate acts: Defendants placed weapons manufactured to kill people into the hands of persons known to be mentally disturbed or intent on committing horrific acts.

205. Defendants' predicate acts were continuous in that they began in the 1940's and continue until today. The public at large is in extreme danger of Defendants' continued pattern of corrupt activities.

## B. **Mail and Wire Fraud**

206. To attempt to carry out the scheme to defraud, Defendants, each of whom is a person associated in fact with the Assault Weapon Fraud Enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the Assault Weapon Fraud Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c). Defendants employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).

207. Specifically, Defendants have committed, conspired to commit and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§1341 and 1343) within the past two years. The multiple acts of racketeering activity that Defendants committed, or aided and abetted in the commission of, were related to each other and also posed a threat of continued racketeering activity. They therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels and employees of the Assault Weapon Fraud Enterprise. Defendants participated in the scheme to defraud by using the mail, telephone and Internet to transmit mailings and wires in interstate or foreign commerce.

208.     In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme and/or artifice to defraud regulators, Members of Congress, and the public to obtain political influence and profits by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal  scheme, Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

209.     Defendants' predicate acts of racketeering, 18 U.S.C. §1961(1), include:

a.  Mail Fraud: Defendants violated 18 U.S.C. §1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell and  distribute the assault weapons by means of false pretenses, misrepresentations, promises and omissions; and

b.  Wire Fraud: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money and political influence on misrepresentations and false pretenses, promises and omissions.

210.     Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery and shipment of deceptive marketing materials, the filling of suspicious orders and the misleading of regulators, Members of Congress and the public as to the utility of and need for assault weapons and the intent of gun control legislation. These materials would not have been delivered, orders would not have been filled and regulators, Members of Congress and the public would have not been misled but for Defendants' illegal  scheme.

211.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been concealed from Plaintiff, and they cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud that occurred. The secretive nature of the Assault Weapon Fraud Enterprise's activities made the unlawful tactics discussed in this Amended Complaint even more deceptive and harmful.

212.     The foregoing allegations support that:

a.     Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market their products through the use of both print and electronic outlets; and

b.   All Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceive regulators and Members of Congress and oversupply the market while failing to report suspicious sales.

## C.  Conspiracy Allegations

213.     Defendants have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c) as described in this Amend Complaint.

214.     Defendants conspired to incentivize and encourage various other persons, firms and corporations, including third-party entities and individuals not named as Defendants in this Amended Complaint, to carry out offenses and other acts in furtherance of the conspiracy.

215.     Defendants conspired to increase or maintain revenues, increase market share and/or minimize losses for Defendants and their other collaborators throughout the illegal scheme and common course of  conduct. In order to achieve this goal, Defendants engaged in the

aforementioned predicate acts on numerous occasions. Defendants, with knowledge and intent, agreed to the overall objectives of conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in defectively marketing and/or selling assault weapons through the use of mail and wire fraud.

216. Indeed, for the conspiracy to succeed, each Defendant had to agree to deceptively market, sell and/or distribute assault weapons while failing to report suspicious sales. The unanimity of Defendants' marketing tactics gave credence to their misleading statements and omissions to consumers, regulators and Members of Congress, and directly caused assault weapons to inundate the market in Ohio and other states.

217. Defendants knew and intended that government regulators, consumers and Members of Congress, would rely on the collective material misrepresentations and omissions made by them and the other Assault Weapon Fraud Enterprise members about assault weapons. Defendants knew and recklessly disregarded the cost that would be suffered by the public, including Plaintiff.

218. The Marketing Defendants knew that by partnering with Members of Congress, they would be able to attribute more credibility to their products, thereby increasing their sales and profits.

219. As a direct and proximate result of each Defendant's conduct and its pattern of racketeering activity, Plaintiff has been injured.

220. Defendants' violations of 18 U.S.C. §1962(c)-(d) have directly and proximately caused injuries and damages to Plaintiff, and Plaintiff is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs and reasonable attorneys' fees in accordance with 18 U.S.C. §1964(c).

## COUNT VII: INTENTIONAL MISREPRESENTATION

**221.** Plaintiff hereby incorporates all the foregoing allegations as if fully rewritten herein.

**222.** Defendants intentionally misrepresented the purpose of the assault weapons.

**223.** Plaintiff relied upon this representation by operating an entertainment venue that should not be, but is subject to risk of mass assault weapon attack.

**224.** Defendants were aware when they stated the purpose of their assault weapons that the assault weapons could be used to commit mass murders and terrorist acts.

**225.** Defendants with wanton disregard for Plaintiff's interests and malice, intentionally misled Plaintiff and thereby have caused damage to Plaintiff for which Defendants are liable in compensatory and punitive damages, interests, costs and attorneys fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in its favor granting the following relief:

A. Entering Judgment in favor of Plaintiff in a final order against each of the Defendants;

B. An immediate order with temporary restraint and a preliminary injunction that precludes Defendants from the sale or distribution of the weapons described in Exhibit A to civilians;

C. A declaration that the weapons described in Exhibit A may not be sold to civilians;

D. A permanent injunction enjoining the sale or  distribution of assault weapons other  than to military and law enforcement establishments;

E. An award of Plaintiff's actual and consequential damages in an amount to be determined at trial;

F.  An award of all damages resulting from Defendants' violation of 18 U.S.C. §1962(c) and (d), including prejudgment interest, the sum trebled pursuant to 18 U.S.C. §1962(c);

G.  An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

H.  Ordering that Defendants compensate the Plaintiff for past and future costs to abate the ongoing public nuisance caused by civilian sales of assault weapons;

I.  Ordering Defendants to fund an "abatement fund" for the purposes of abating the public nuisance;

J.  An award of punitive damages as allowed by law;

K.  An award of Plaintiff's costs, including reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c); and

L.  Such other relief, both legal and equitable, as is reasonable and just.

Respectfully submitted,

s/Thomas D. Lambros
Thomas D. Lambros
341 S. Third Street, Suite 10
Columbus, Ohio 43215
Telephone:  440-813-3699
Email:  tdlambros@gmail.com
and

PERCY SQUIRE (0022010)
PERCY SQUIRE CO., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
Telephone: (614) 224-6528
Facsimile: (614) 224-6529
psquire@sp-lawfirm.com
Counsels for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing has been

electronically filed and served via the Court's electronic filing service upon counsel of record on

September 16, 2019.

*/Percy Squire, Esq.*

Percy Squire, Esq. (0022010)
